GUSTAFSON GLUEK PLLC
David A. Goodwin
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgoodwin@gustafsongluek.com

MIGLIACCIO & RATHOD LLP
Matthew Smith
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: (831) 687-8255
msmith@classlawdc.com

*Counsel for Plaintiff and Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| Nicholas Furia, on behalf of himself and all others similarly situated, | Case No.: |
| Plaintiff, | **CLASS ACTION** |
| vs. | **COMPLAINT FOR NEGLIGENCE, BREACH OF IMPLIED CONTRACT, INVASION OF PRIVACY AND UNJUST ENRICHMENT** |
| 23ANDME, Inc. | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Nicholas Furia ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following Class Action Complaint (the "Action") against Defendant 23andMe, Inc. ("23andMe" or "Defendant") upon personal knowledge as to themselves and their actions, and upon information and belief, including the investigation of counsel as follows:

### I.     SUMMARY

1.      Defendant is a biotechnology company that maps the unique individual genomes of customers to create personalized genetic reports on subjects including ancestry and genetic health risks *inter alia*.[1] Defendant has more than 14 million customers worldwide.[2]

2.      Plaintiff brings this Action on behalf of themselves and all other similarly situated victims as a result of a recent cyberattack and data breach involving the personally identifiable information ("PII") and personal health information ("PHI") of customers of Defendant ("Customers").

3.      On or about October 6, 2023, Defendant announced, that unauthorized access to customer PII had taken place.[3]

4.      Defendant's failure to adequately safeguard the sensitive information of customers that entrusted them to do so directly resulted in criminal hackers accessing and compiling the following types of PII and PHI (collectively, "PII"):

Names, sex, date of birth, genetic ancestry results, profile photos, and geographical location.

5.      23andMe owed a non-delegable duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Private Information against unauthorized access and disclosure.

6.      In the announcement posted to 23andMe's website ("Press Release" or "Notice"), 23andMe explains:

> "We recently learned that certain 23andMe customer profile information that they opted into sharing through our DNA Relatives feature, was compiled from individual 23andMe.com accounts without the account users' authorization.

---

[1]   https://www.23andme.com/# (last visited Oct. 16, 2023)
[2] https://medical.23andme.com/#:~:text=23andMe%20has%20more%20than%2014,own%20homes%2C%20without%20medical%20requisition (last visited Oct. 16, 2023).
[3]   https://blog.23andme.com/articles/addressing-data-security-concerns  (last visited Oct. 16, 2023).

> After learning of suspicious activity, we immediately began an investigation. While we are continuing to investigate this matter, we believe threat actors were able to access certain accounts in instances where users recycled login credentials – that is, usernames and passwords they were used on 23andMe.com were the same as those used on other websites that have been previously hacked,
>
> We believe the threat actor may have then, in violation of our Terms of Service, accessed 23andMe.com accounts without authorization and obtained information from certain accounts, including information about users' DNA Relatives profiles, to the extent a user opted into that service."

7.     The Notice's deficiencies include: (1) 23andMe fails to state whether they successfully contained or ended the cybersecurity threat, leaving victims to fear that PII in 23andMe control remains insecure; and (2) 23andMe fails to state how the breach itself occurred. This information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity and wide array of information compromised.

8.     As a result of the Data Breach, Plaintiff and Class Members suffered injury and ascertainable losses in the form of the present and imminent risk of fraud and identity theft, loss of the benefit of their bargain, out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigating the effects of the attack, and the diminished or lost value value of their PII.

9.     In addition, Plaintiff's and Class Members' sensitive PII remains in Defendant's possession. Without additional safeguards and independent review and oversight, it remains vulnerable to future cyberattacks and theft.

10.     The Data Breach was a direct result of Defendant's failure to implement adequate, and reasonable cyber-security procedures and protocols necessary to protect victims' PII.

11.     Plaintiff brings this class action lawsuit on behalf of those similarly situated to

address Defendant's inadequate protections for Class Members' PII which Defendant collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to unauthorized access by an unknown third party.

12.     Defendant maintained the PII on its computer network recklessly by leaving it in a condition vulnerable to cyberattacks.

13.     The mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant and entities like it. Defendant was therefore on notice that failure to take steps necessary to secure the PII against those risks left that PII in a dangerous condition and vulnerable to theft. Defendant was on notice of the sever consequences that would harm Plaintiff and Class Members from its failure to safeguard their  PII.

14.     Defendant disregarded the rights of Plaintiff and Class Members (as defined *infra* below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized access; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard member PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on proper security measures; and failing to provide Plaintiff and Class Members prompt notice of the Data Breach.

15.     In addition, Defendant and its employees failed to properly monitor the computer network and systems that housed the PII. If Defendant had properly monitored its computer network and systems, it would have discovered the intrusion sooner, instead of letting cyberthieves roam freely in Defendant's IT network unimpeded and unknown period of time.

16.     Defendant's negligent conduct has placed Plaintiff's and Class Members' PII at risk since the PII that Defendant collected and maintained is now in the hands of data thieves. This present risk will continue for Plaintiff's and Class Members' respective lifetimes.

17.     Indeed, several new outlets have reported that Plaintiff's and the Class Members' data including names, gender, birth years, and additional genetic data is already for sale on the black market[4]:

18.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a present and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

19.     Plaintiff and Class Members will incur out of pocket costs for undertaking protective measures to deter and detect identity theft.

20.     Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose PII was accessed during the Data Breach.

21.     Plaintiff seeks remedies including, but not limited to, actual damages, compensatory damages, nominal damages, and reimbursement of out-of-pocket costs.

22.     Plaintiff also seeks injunctive and equitable relief to prevent future injury on behalf of himself and the putative Class.

II.     JURISDICTION AND VENUE

23.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interests and costs, there are more than 100 members of the proposed class, and at least one Class Member is a citizen of a state different from Defendant

---

[4]  https://www.pelhamplus.com/us-news/stolen-user-data-from-23andme-users-emerges-on-breachform/ (last accessed October 16, 2023)

to establish minimal diversity, namely, Plaintiff Monica Santana is a Florida resident and Plaintiff Paula Kleynburd is a New York resident whereas Defendant's principal place of business is within this District.

24.     This Court has personal jurisdiction over Defendant because Defendant is headquartered and does substantial business from and within this District.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District

## III.     PARTIES

26.     Plaintiff Nicholas Furia is an adult who at all relevant times was a citizen of Minneapolis, Minnesota and has been a customer of 23andMe since 2018. Furia's PII was stored and handled by Defendant on its system.

27.     Defendant 23andMe, Inc. is a biotechnology company that individuals' unique genome for the purpose of creating personalized reports on subjects including ancestry to genetic health risks.

## IV.     FACTUAL ALLEGATIONS

### *Defendant's Data Collection and Duties*

28.     According to Defendant's website:

> 23andMe has more than 14 million customers worldwide.  Our Health + Ancestry and Membership service allows individuals to acquire this information from the privacy of their own homes, without medical requistion. [5]

---

[5]   https://medical.23andme.com (last visited Oct. 6, 2023)

29.     Defendant collects PII from their customers in the course of doing business. This PII includes the PII which was compromised in the Data Breach alleged herein.

30.     Prior to receiving services from Defendant, Plaintiff and Class Members were required to and did in fact turn over their PII.

31.     Upon information and belief, Defendant promises to maintain the confidentiality of Plaintiff's and Class Members' PII to ensure compliance with federal and state laws and regulations, and not to use or disclose Plaintiff's and Class Members' PII for non-essential purposes.

32.     Defendant's Privacy Policy states, "[w]e encrypt all sensitive information and conduct regular assessments to identify security vulnerabilities and threats."

33.     As a condition of receiving Defendant's services, Defendant requires that Plaintiff and Class Members entrust it with highly sensitive PII.

34.     By collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it had a duty to protect Plaintiff's and Class Members' PII from unauthorized disclosure.

35.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members would not have entrusted Defendant with their PII if they knew Defendant would fail to implement industry standard protections for it.

36.     Plaintiff and the Class Members relied on Defendant to keep their PII confidential and secure, to use this information strictly for business purposes only, and to make only authorized disclosures of this sensitive information.

***The Data Breach***

37.     Defendant informed Plaintiff and the Class Members via the Press Release cited *supra* at paragraph 6.  According to the Press Release, the compromised PII includes, but is not limited to, Customers' names, sex, date of birth, genetic ancestry results, profile photos, geographical location and other information and data provided to 23andMe.

38.     In its Press Release, 23andMe also encourages the victims confirm they have strong passwords and ensure the use of multi-factor authentication (MFA). Through these statements, Defendant acknowledges that Plaintiff and Class Members are subject to an imminent threat of fraud and identity theft.

39.     Due to Defendant's inadequate security measures, Plaintiff and the Class Members face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

40.     Upon information and belief, Plaintiff's and Class Members' PII was not encrypted prior to the data breach.

41.     Upon information and belief, the cyberattack was targeted at Defendant as a company that collects and maintains valuable PII from its many Customers, including Plaintiff and Class Members.

42.     Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data, including (among other things) Plaintiff's and Class Members' PII.

43.     Defendant had duties to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

44.     Plaintiff and Class Members provided their PII to Defendant with the reasonable expectation that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

***Defendant Knew the Risk of Storing Valuable PII and the Foreseeable Harm to its Customers***

45.     It is well known that PII is an invaluable commodity and a frequent target of hackers.

46.     In 2021, alone, data breaches reached  record annual total of 1,862.[6]

47.     A substantial portion of PII's value depends on that data remaining private. Identity theft, for example, is known to carry not only significant negative financial impact on victims, but also severe emotional distress and other strong emotions and physical reactions.

48.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and thwart such an attack.

49.     Despite the prevalence of public announcements of data breach and data security compromises, and despite Defendant's own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiff and the proposed Class Members from being compromised.

***Defendant Breached it Duty to Protect Its Customers' PII***

50.     At all relevant times, Defendant had a duty to Plaintiff and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion,

---

[6] Bree Fowler, Data breaches break record in 2021, CNET (Jan. 24, 2022), https://www.cnet.com/news/record-number-of-data-breaches-reported-in-2021-new-report-says/

act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to *promptly* notify Plaintiff and Class Members when Defendant became aware that their PII may have been compromised.

51.     Defendant's duty to use reasonable security measures arose from the special relationship that existed between Defendant and the Plaintiff and the Class Members. The special relationship arose because Plaintiff and Class Members relied on Defendant to secure their PII when they entrusted Defendant with the information required to obtain Defendant's services.

52.     Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect Customers' PII. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiff and Class Members.

53.     Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

    a.    Maintaining a secure firewall configuration;

    b.    Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

    c.    Monitoring for suspicious or irregular traffic to servers;

    d.    Monitoring for suspicious credentials used to access servers;

    e.    Monitoring for suspicious or irregular activity by known users;

    f.    Monitoring for suspicious or unknown users;

    g.    Monitoring for suspicious or irregular server requests;

    h.    Monitoring for server requests for PII;

    i.    Monitoring for server requests from VPNs; and

j.    Monitoring for server requests from Tor exit nodes.

54.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[7] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[8]

55.    The ramifications of Defendant's failure to keep its Customers' PII secure are long lasting and severe. Once PII is stolen, the threat of fraudulent use of victims from that information's disclosure continues for years.

### *The Value of PII*

54.    Consumer's PII is of high value to criminals, as evidenced by the prices it commands on the dark web.  Personal information is sold for between $40 to $200 and bank details between $50 to $200.[9] In 2021, payment card details for account balances up to $1,000 have an average market value of $150, credit card details with account balances up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on

---

[7]  17 C.F.R§248.201 (2013)
[8]  *Id.*
[9]  Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/
(last accessed Oct. 16, 2023 .

the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[10]

55.     As a growing number of federal courts recognize that PII's lost value is a viable theory of damages, it is critical that courts understand how the dark web's ability to enable anonymous transactions makes the sale of PII, such as from the Data Breaches, described herein, particularly harmful to victims.

56.     The dark net is an unindexed layer of the internet that requires special software or authentication to access.[11] Unlike traditional internet access, dark web users must know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[12] This prevents authorities from easily identifying participants in dark web marketplaces.

57.     The dark web hosts a robust black market where criminals may buy or sell malware, firearms, drugs, and personal and medical information like the PII described herein[13]. The digital character of PII stolen in data breaches lends itself to dark web because criminals may immediately transmit it over the internet and the buyers and sellers can complete transactions anonymity.  Malicious actors can easily purchase sensitive financial information, login credentials, and other sensitive PII like Social Security numbers, dates of birth and medical

---

[10]  Dark Web Price Index 2021, Zachary Ignoffo, March 8, 2021, available at: https://www.privacyaffairs.com/dark-web-price-index-2021/ (last accessed Oct. 16, 2021).
[11]  What Is the Dark Web?, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/
[12]  *Id.*
[13]  What is the Dark Web? – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web

information. [14] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[15]

58.      Plaintiff and Class Members' PII is a valuable commodity for which a market exists, and Plaintiff's and Class Members' PII is likely already being sold by hackers on the dark web.[16] As a result, Plaintiff's and Class Members' has lost the value, which is suffices to plausibly allege injury arising from a data breach.

59.      A robust legitimate marketplace for PII also exists. Estimates placed the value of the data brokering industry in 2019 at roughly $200 billion. [17] Customers may sell their non-public data directly to data brokers, who in turn aggregate it and sell it to third parties like marketers or app developers.[18][19]

60.      PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[20] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[21]

---

[14]  Id.; What Is the Dark Web?, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/
[15]  What is the Dark Web? – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web

[16]  https://www.pelhamplus.com/us-news/stolen-user-data-from-23andme-users-emerges-on-breachforum/ (last accessed October 16, 2023).
[17]  https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[18]  https://datacoup.com/
[19]  https://worlddataexchange.com/about

[20]  See Andrew Steager, What Happens to Stolen Healthcare Data, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("What Happens to Stolen Healthcare Data") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[21]  Id.

61.     PII and PHI are valuable commodities, susceptible to quantitative valuation, in which Plaintiff and Class Members have property rights.[22][23]

62.     According to a report released by the Federal Bureau of Investigation's (FBI) Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[24]

63.     Criminals can use stolen PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[25] "Traditional criminals understand the power of coercion and extortion. . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[26]

64.     Consumers place a premium on data privacy, as they should. Studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[27]

65.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII  has deprived that consumer of the full monetary value of the consumer's transaction with the company.

***FTC Guidelines Prohibit Defendant from Engaging in Unfair or Deceptive Acts or Practices***

---

[22]  *See* Marc van Lieshout, The Value of Personal Data, 457 INT'L FED'N FOR INFO. PROCESSING (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[23]  *See* Robert Lowes, Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[24]  *See* Federal Bureau of Investigation, Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf

[25]  *What Happens to Stolen Healthcare Data*, *supra* note 20.

[26]  *Id.*

[27]  Janice Y. Tsai et al., The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable /23015560?seq=1.

66.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

67.     The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect the personal customer information they acquire; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[28]

68.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for high volume data transmissions; and have a prepared response plan in the event of a breach.[29]

69.     The FTC further recommends that companies not maintain PII longer than is needed to authorize a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested security methods; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

70.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

---

[28]  Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016).  Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 2, 2023).

[29]  *Id.*

unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

71.     Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications described above help constitute Defendant's duty in this regard.

72.     Defendant failed to properly implement basic data security practices.

73.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class members' PII or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

74.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of its customers, Defendant was similarly aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the immense damages that would result to Plaintiff's and Class Members.

***Defendant Fails to Comply with Industry Standards***

75.     Several best practices have been identified that, at a minimum, should be implemented by entities in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus,

and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

76.     Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; securing web browsers and email management systems; establishing network systems such as firewalls, switches and routers; monitoring and protecting physical security systems; protecting against any possible communication system; and training staff critical points of vulnerability. Defendant failed to follow these cybersecurity best practices, including failing to train staff.

77.     Upon information and belief, Defendant failed to comply with one or more of these accepted standards, thereby exposing Plaintiff's and Class Members' PII to the risk of unauthorized access and causing the Data Breach.

### *Theft of Private Information Has Grave and Lasting Consequences for Victims*

78.     Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, obtain medical treatment, open new utility accounts, and incur charges and credit in a person's name.[30]

79.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[31]  Identity thieves may also obtain a driver's license or official identification in the victim's name but with the thief's picture; use the

---

[30]  *See*  Federal Trade Commission, *What to Know About Identity Theft,* FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last visited Oct. 2, 2023).

[31]  The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or

victim's name and Social Security number to obtain government benefits; or file fraudulent tax returns in the victim's name.[32]

80.     Victims face an uphill battle mitigating the harms of identity theft.  Most victims of identity crimes require more than a month to resolve issues stemming from identity theft and some need over a year.[33]

81.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[34] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[35] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[36] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[37]

82.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

_____

number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[32] *See* Federal Trade Commission, Warning Signs of Identity Theft, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Oct. 2, 2023).

[33] See Identity Theft Resource Center, 2021 Consumer Aftermath Report, IDENTITY THEFT RES. CTR. (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last visited Oct. 2, 2023).

[34] Pam Dixon and John Emerson, The Geography of Medical Identity Theft, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf .

[35] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk…*, *supra* note 23.

[36] See What to Know About Medical Identity Theft, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Oct. 2, 2023).

[37] *Id.*

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services neither sought nor received.

  - Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime. For example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; and victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[38]

83.     There are also frequent time lags between the theft of PII, when it is used, and when a person discovers its use. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[39]

84.     This is the backdrop against which Plaintiff and Class members must now struggle with the knowledge that their PII's privacy is forever compromised and was taken by,

---

[38] *See* Pam Dixon and John Emerson, *The Geography of Medical Identity Theft, supra* note 39.
[39] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

and remains in the possession of, people willing to use the information for any number of improper purposes, including making the information available for sale on the black-market.

### *Common Injuries and Damages*

85.     As a result of Defendant's deficient data security practices and inadequate data, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class members has materialized and is present and continuing. Plaintiff and Class members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the risk and imminent threat of identity theft; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; (e) the continued risk that their PII which remains in the possession of Defendant is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### *The Data Breach Increases Victims' Risk of Identity Theft*

86.     Plaintiff and Class members are at a heightened risk of identity theft for their lifetimes.

87.     The unencrypted PII of Class members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use, without Plaintiff's and Class Members' approval, detailed PII for targeted marketing. Unauthorized individuals can easily access the PII of Plaintiff and Class members.

88.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

89.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime. With just a name and date of birth, a data thief can utilize a technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victims.

90.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[40]

---

[40]  "Fullz" is criminal shorthand for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more profitable the sale of that information is. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. See, e.g., Brian Krebs, Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

91.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy, and thereby assemble complete dossiers on individuals.

92.     The criminal practice of developing "Fullz" packages means that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class members' phone numbers, email addresses, and other sources and identifiers available elsewhere. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals over and over.

93.     The existence and prevalence of "Fullz" packages means that even if certain information (e.g., driver's license numbers) was not stolen in the Data Breach, the PII stolen from the Data Breach can easily be linked to data about Plaintiff and Class members available elsewhere, such that criminal can easily create a comprehensive "Fullz" dossier.

94.     Then, this comprehensive dossier can be sold—and resold in perpetuity—to criminal operators.

### Loss of Time to Mitigate Risk of Identity Theft and Fraud

95.     As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

96.     Plaintiff and Class members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the nature of the Data Breach as well as monitoring their accounts for any indication of fraudulent activity, which may take years to detect.

97.     Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[41]

98.     Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[42]

### *Future Cost Of Credit and Identity Theft Monitoring Is Reasonable And Necessary*

99.     Given the type of sophistication and targeted nature in this case, the type of PII involved, and the volume of data obtained in the Data Breach, upon information and belief, entire batches of stolen information have been placed on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes—*e.g*., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment benefits.

---

[41] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[42] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Oct. 2, 2023)

100.     Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[43] The information disclosed in this Data Breach is impossible to 're-secure,' and impossible to change (such as genetic markers).

101.     Consequently, Plaintiff and Class members are at a present and continuous risk of fraud and identity theft for the remainder of their lives.

102.     The retail cost of credit monitoring and identity theft monitoring is around $200 a year per Class member. This is a reasonable and necessary to protect Class Members from the risk of identity theft that the Data Breach created. This is a future cost that Plaintiff and Class Members would not incur but for Defendant's failure to safeguard their PII.

### *Loss Of The Benefit Of The Bargain*

103.     Defendant's poor data security deprived Plaintiff and Class members of the benefit of their bargain. When agreeing to pay Defendant for products and/or services, reasonable consumers, including Plaintiff and Class members, understood and expected that they were, in part, paying for the necessary data security to protect their PII, when Defendant did not in fact provide the expected data security. Accordingly, Plaintiff and Class members received products and/or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### *Plaintiff Nicholas Furia's Experience*

104.     Plaintiff  Furia is a customer of Defendant. Defendant provided Plaintiff with

---

[43]  *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds,* FORBES (Mar. 25, 2020),  https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1

insight into diseases and familial matches as a result of an analysis of Plaintiff's genome.

105.    As a condition to utilize Defendant's services, Plaintiff was required to provide and did provide his PII to Defendant. Plaintiff was also required to provide a DNA sample for analysis.

106.    Plaintiff is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

107.    At the time of the Data Breach, Defendant retained Plaintiff's PII in its system.

108.    Subsequent to the Data Breach, Plaintiff has suffered numerous, substantial injuries including, but not limited to: (i) lost or diminished value of her PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) lost time spent on activities remedying harms resulting from the Data Breach; (iv) invasion of privacy; (v) loss of benefit of the bargain; and (vi) the continued and increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

109.    Plaintiff also suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy and PII, being in the hands of criminals.

110.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

111.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis trying to mitigate and address harms caused by the Data Breach.

112.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

113.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**V.     CLASS ACTION ALLEGATIONS**

114.    Plaintiffs bring this suit on behalf of himself and a class of similarly situated individuals under Federal Rule of Civil Procedure 23, which is preliminarily defined as:

> All persons whose PII or PHI was compromised in the Data Breach by unauthorized persons. (the "Class").

115.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

116.    **Numerosity**. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, it is likely that hundreds, if not thousands, of individuals had their PII compromised in this Data Breach, given the Defendant operates in over 100 markets in the United States. The identities of Class Members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

117. **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, but are not limited to:

    i.    Whether 23andMe failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    ii.    Whether 23andMe had a duty not to disclose the PII of Plaintiff and Class members unauthorized third parties;

    iii.    Whether 23andMe failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII;

    iv.    Whether 23andMe breached a fiduciary duty to Plaintiff and Class Members when it failed to protect their PII;

    v.    Whether 23andMe was unjustly enriched when it did not provide adequate data security in return for the benefit Plaintiff and Class members provided;

    vi.    Whether 23andMe breached its duties to protect Plaintiff's and Class members' PII; and

    vii.    Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

118. **Typicality**. Plaintiff's claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class member, was compromised in the Data Breach.

119.     Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's Counsel is competent and experienced in litigating Class actions, including data privacy litigation of this kind.

120.     **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

121.     **Superiority**. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer administrative difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

122.     Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

123.     Likewise, particular issues under Federal Rule 23(c)(4) are appropriate for

certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      i.    Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, and safeguarding their PII;

      ii.    Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

      iii.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence; and

      iv.    Whether Defendant failed to take commercially reasonable steps to safeguard PII,

124.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach

## VI.    CAUSES OF ACTION

### <u>COUNT I</u>
### NEGLIGENCE
### (On behalf of Plaintiff and all Class Members)

125.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

126.    Defendant knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII for financial gain, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

127.    Defendant had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII.

128.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed. The harm that Plaintiff and Class Members experienced was within the zone of foreseeable harm known to Defendant.

129.    Defendants' duty to use reasonable security measures arose from the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a mandatory step in receiving services from Defendant. While this special relationship exists independent from any contract, it is recognized by Defendant's privacy practices, as well as applicable laws and regulations. Specifically, Defendant actively solicited and gathered PII as part of its businesses and was solely responsible for and in the position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a resulting data breach.

130.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and the Class, to maintain adequate data security.

131.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices and the frequency of data breaches in general.

132.    Defendant also had a common law duty to prevent foreseeable harm to others. Plaintiff and the Class were the foreseeable and probable victims of Defendant's deficient security practices. Defendant knew or should have known of the inherent risks in

collecting and storing the PII of Plaintiff and the Class, the critical importance of adequately safeguarding that PII, and the necessity of encrypting PII stored on Defendant's systems. It was foreseeable that Plaintiff and Class members would be harmed by the failure to protect their PII because hackers are known to routinely attempt to steal such information and use it for nefarious purposes.

133.    Defendant's conduct created a foreseeable risk of harm to Plaintiff and the Class. Defendant's wrongful conduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decision not to comply with industry standards for the safekeeping of Plaintiff's and the Class's PII, including basic encryption techniques available to Defendant.

134.    Plaintiff and the Class had and have no ability to protect their PII that was in, and remains in, Defendant's possession.

135.    Defendant was in a position to effectively prevent against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

136.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

137.    Defendant, through its actions and/or omissions, unlawfully breached its duty to

Plaintiff and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII within Defendant's possession.

138.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff's and Class Members' PII.

139.    Defendant, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiff and Class Members that the PII within Defendant's possession might have been compromised and precisely the type of information compromised.

140.    Defendant's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' PII to be compromised.

141.    Pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), Defendant had a separate and independent duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII.

142.    The FTCA is intended, in part, to protect individuals whose PII is maintained by another and who are unable to safeguard their information as they cannot exercise control or direction over the data security practices.

143.    Plaintiff and Class Members of the are within the class of persons that the FTCA was intended to protect as their PII was collected and maintained by Defendant and they were unable to exercise control over Defendant's data security practices.

144.    The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against.

145.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm that Plaintiff and Class Members have suffered.

146.   Defendant breached its duties to Plaintiff and Class Members under Federal Trade Commission Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII.

147.   Had Plaintiff and Class Members known that Defendant would not adequately protect their PII, they would not have entrusted Defendant with their PII.

148.   Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

149.   But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, they would not have been injured.

150.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet their duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

151.   As a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and the Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes; (v) lost opportunity costs

associated with effort expended and productivity lost attempting to mitigate the present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and other identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect customers' PII in their continued possession; and (viii) present and future costs in the form of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the compromised PII as a result of the Data Breach for the remainder of Plaintiff's and the Class Members' lives.

152.    As a direct and proximate result of Defendants' negligence and negligence per se, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

153.    Additionally, as a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

154.    As a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and Class Members are now at an increased risk of identity theft or fraud.

155.    As a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and Class Members are entitled to and demand actual, consequential, and nominal damages and injunctive relief to be determined at trial.

## COUNT II
### BREACH OF IMPLIED CONTRACT
#### (On behalf of Plaintiff and all Class Members)

156.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

157.    Plaintiff and Class Members entrusted their PII to Defendant as a condition of receiving Defendant's services. In so doing, Plaintiff and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

158.    At the time Defendant acquired the PII of Plaintiff and Class Members, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the PII and not take unjustified risks when storing the PII.

159.    Implicit in the agreements between Plaintiff, Class Members, and Defendant, to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

160.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

161.    Defendant breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and Class Members once the relationship ended, and by failing to

provide timely and accurate notice to them that personal information was compromised as a result of the Data Breach.

162.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

163.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages to be determined at trial.

## COUNT III
## INVASION OF PRIVACY – INTRUSION UPON SECLUSION

164.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

165.    Plaintiff and Class Members have a legally protected privacy interest in their PII, which is and was collected, stored and maintained by Defendant, and they are entitled to the reasonable and adequate protection of their PII against foreseeable unauthorized access, such as the Data Breach.

166.    Plaintiff and Class Members reasonably expected that Defendant would protect

and secure their PII from unauthorized parties and that their PII would not be accessed, exfiltrated, or disclosed to any unauthorized parties or for any improper purpose.

167.    Defendant intentionally intruded into Plaintiff's and Class Members' seclusion by disclosing without permission their PII to a third party. Defendant's acts and omissions giving rise to the Data Breach were intentional insofar as the decisions to implement lax security and failure to timely notice Plaintiff and Class Members were willful and intentional.

168.    By failing to keep Plaintiff's and Class Members' PII secure, and disclosing PII to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiff's and Class Members' right to seclusion by, *inter alia*:

     a.   intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

     b.   invading their privacy by improperly using their PII obtained for a specific purpose for another purpose, or disclosing it to unauthorized persons;

     c.   failing to adequately secure their PII form disclosure to unauthorized persons; and

     d.   enabling the disclosure of their PII without consent.

169.    This invasion of privacy resulted from Defendant's intentional failure to properly secure and maintain Plaintiff's and Class Members' PII, leading to the foreseeable unauthorized access, exfiltration, and disclosure of this unguarded private data.

170.    Plaintiff's and Class Members' PII is the type of sensitive, personal information that one normally expects will be protected from exposure by the very entity charged with safeguarding it. Further, the public has no legitimate concern in Plaintiff's and Class Members' PII, and such information is otherwise protected from exposure to the public by various statutes, regulations and other laws.

171.    The disclosure of Plaintiff's and Class Members' PII to unauthorized parties is substantial and unreasonable enough to be legally cognizable and is highly offensive to a

reasonable person.

172.    Defendant's willful and reckless conduct that permitted unauthorized access, exfiltration and disclosure of Plaintiff's and Class Members' sensitive PII is such that it would cause serious mental injury, shame or humiliation to people of ordinary sensibilities.

173.    The unauthorized access, exfiltration, and disclosure of Plaintiff's and Class Members' PII was without their consent, and in violation of various statutes, regulations and other laws.

174.    As a direct and proximate result of Defendant's intrusion upon seclusion, Plaintiff and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiff and Class Members alternatively seek an award of nominal damages.

**COUNT IV**
**UNJUST ENRICHMENT**

175.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

176.    This Count is brought in the alternative to Count II, Breach of Implied Contract.

177.    Plaintiff and Class Members conferred a monetary benefit on Defendant, by providing Defendant with their valuable PII. In so conferring this benefit, Plaintiff and Class Members understood that part of the benefit Defendant derived from the PII would be applied to data security efforts to safeguard the PII.

178.    Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

179.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and

Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

180.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

181.    Defendant acquired the monetary benefit and PII through inequitable means insofar as they failed to disclose the inadequate security practices alleged herein.

182.    If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

183.    Plaintiff and Class Members have no adequate remedy at law.

184.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the

PII compromised as a result of the Data Breach for the remainder of Plaintiff and Class Members' lives.

185.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

186.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On behalf of Plaintiff and all Class Members)**

187.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

188.    Defendant owes duties of care to Plaintiff and Class Members that require Defendant to adequately secure their PII.

189.    Defendant still possess Plaintiff's and Class Members' PII.

190.    Plaintiff and Class Members are at risk of harm due to the exposure of their PII and Defendant's failure to address the security failings that lead to such exposure.

291.    Plaintiff, therefore, seeks a declaration that (1) Defendant's existing security measures do not comply with its duties of care to provide reasonable security practices appropriate to the nature of the information to protect customers' PII, and (2) to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

    a.  Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering

Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.  Engaging third-party security auditors and internal personnel to run automated security monitoring;

c.  Auditing, testing, and training its security personnel regarding any new or modified procedures;

d.  Segmenting user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.  Conducting regular database scanning and security checks;

f.  Routinely conducting training and education to educate internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g.  Purchasing credit monitoring services for Plaintiff and Class Members for a period of ten years; and

h.  Meaningfully educating Plaintiff and Class Members about the threats they face as a result of the loss of their PII and PHI to third parties, as well as the steps they must take to protect themselves.

## VII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class defined herein, prays for judgment as against Defendant as follows:

a.  For an Order certifying this action as a Class action and appointing Plaintiff and her counsel to represent the Class;

b.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein regarding the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c.  For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Breach;

d.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e.  Ordering Defendant to pay for lifetime credit monitoring services for Plaintiff and the Class;

f.  For an award of actual damages, compensatory damages, statutory damages and statutory penalties, in an amount to be determined, as allowable by law;

g.  For an award of punitive damages, as allowable by law;

h.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.  Pre-and post-judgment interest on any amounts awarded and,

j.  All such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

## DOCUMENT PRESERVATION DEMAND

Plaintiff demands that Defendant take affirmative steps to preserve all records, lists, electronic databases, or other itemization of telephone numbers associated with the communication or transmittal of the calls as alleged herein.

DATED: October 27, 2023                    Respectfully submitted,

By:     /s/ Matthew Smith

Matthew Smith (SBN 309392)
msmith@classlawdc.com
**MIGLIACCIO & RATHOD LLP**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: (831) 687-8255

Daniel E. Gustafson *
David A. Goodwin *
Matt Jacobs *
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
mjacobs@gustafsongluek.com

*Attorneys for Plaintiff and Punitive Class*
*\*Pro Hac Vice Forthcoming*